UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS THOMSON,

        Plaintiff,

Case No. 1:12-cv-534

Hon. Robert J. Jonker

v.

DANIEL SPITTER and
BADAWI ABDELLATIF,

        Defendants.

_____/

**REPORT AND RECOMMENDATION**

This is a civil rights action brought by a state prisoner incarcerated by the Michigan Department of Corrections ("MDOC") pursuant to 42 U.S.C. § 1983. This matter is now before the court on a motion for summary judgment filed by defendants Daniel Spitters, P.A. and Badawi Abdellatif, M.D. (docket no. 8).[1] Defendants' motion is unopposed.

    **I.**     **Background**

Plaintiff filed his complaint on May 24, 2012. See Compl. (docket no. 1). In his complaint, plaintiff alleged that the two defendants, P.A. Spitters and Dr. Abdellatif, were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment because they did not provide proper medication for his reported seizures and panic attacks from approximately September 12, 2011 through November 14, 2011. *Id.* Plaintiff set forth the following allegations in his complaint.

---

[1] The Court notes that defendant Daniel Spitters is identified on the docket sheet as "Daniel Spitter."

Plaintiff is 51 years old and currently incarcerated by the MDOC. *Id.* at ¶ 1. In 2006, plaintiff suffered a "grand mal" seizure, was taken to the hospital and diagnosed with a severe seizure disorder and panic attacks. *Id.* at ¶ 2. When plaintiff was incarcerated by the MDOC in 2006 and 2007, his condition was "recognized" by the staff and he was treated with Clonazepam (Klonopin) pursuant to a physician's order. *Id.* at ¶ 4. He remained on Clonazepam after his discharge from the MDOC for a period extending from March 2007 through September 11, 2011. *Id.* at ¶ 5. Plaintiff returned to the MDOC on a parole violation where he was "unjustly and abruptly" taken off this medication "after numerous disputes with the Physician's Assistant (i.e. Night Shift Nurse)". *Id.* at ¶¶ 5-6. Plaintiff spoke with defendants on September 13, 2011 regarding several small seizures which, according to plaintiff, he had suffered due to not receiving his daily dose of Clonazepam. *Id.* at ¶ 6.[2] After plaintiff had a "short, but heated discussion" with defendant Spitters on this matter, Spitters told plaintiff something to the effect that "[t]oo bad, you shouldn't have given my Assistant so many problems." *Id.* Plaintiff explained to Spitters that he had been taking the medication for years and that the recent change was having adverse risks on his health. *Id.* Plaintiff threatened to file a grievance regarding Spitters' "unwarranted interference" with his medication, to which Spitters allegedly responded "[i]t's [your] word against mine, make sure you spell my name right." *Id.* Plaintiff then spoke with defendant Dr. Abdellatif, who stated that he could not help plaintiff. *Id.*

Plaintiff filed a grievance on November 14, 2011 (more than two months after he was taken off of the Klonopin), alleging that he was suffering constant seizures and severe anxiety due

---

[2] The Court notes that the complaint erroneously states that the confrontation occurred on September 13, 2012 rather than September 13, 2011.

2

to the "unwarranted discontinuation of his prescribed medication." *Id.* at ¶ 7. Plaintiff alleged that his seizures "required healthcare emergency response" and sent medical kites in "mid November of 2011" alleging that he suffered violent seizures and severe anxiety. *Id.* at ¶¶ 7-8. Plaintiff's condition worsened in late November, but per defendant Spitters' order "no [accommodations] were made." *Id.* at ¶ 9. Plaintiff continued to suffer violent seizures over several months. *Id.* at ¶ 10.

Based on these facts, plaintiff alleged that defendants were deliberately indifferent because they failed to provide him medication for a known medical condition, which resulted in plaintiff suffering seizures and anxiety commencing on September 12, 2011. *Id.* at ¶¶ 11-16. In addition, plaintiff alleged that defendants "intentionally retaliated" against him. *Id.* at ¶ 17.[3] Plaintiff seeks punitive damages against defendants in the amount of $900,000.00. *Id.* at p. 5.

## II. Defendants' motion for summary judgment

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

[3] Plaintiff's complaint embellished the allegation of retaliation, adding that defendants' conduct "was not a mere oversight but rather a [preconceived] action with criminally culpable state of mind resulting in gross negligence." Compl. at ¶ 17. The Court does not consider this embellishment as sufficient to allege any additional cause of action.

3

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

Here, defendants' motion is unopposed. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2nd Cir. 1996). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992).

### B. Deliberate indifference

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any

4

right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 3 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

Defendants move for summary judgment on the ground that they were not deliberately indifferent to plaintiff's serious medical needs. It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

5

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. Thus,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106. *See Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) ("a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment"); *Clemmons v. Bohannon*, 956 F.2d 1523, 1529 (10th Cir. 1992) ("the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment"). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 1. Plaintiff's three affidavits

In support of his claim that he suffered multiple seizures, plaintiff attached three papers to his complaint which he referred to as "affidavits from eyewitness inmates." Compl. at ¶

7; Exhibits B, C, and D (docket nos. 1-1 at pp. 7-9 and 1-2 at p. 2). However, these papers are not "affidavits" which could create a genuine issue of material fact to avoid summary judgment under Fed. R. Civ. P. 56(c)(1)(A). As an initial matter, Exhibit C is not signed. In addition, none of the "affidavits" are notarized. The absence of a jurat or other evidence of verification requires a court to find that the document fails to constitute an affidavit. *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished). *See Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930) ("[a] purported affidavit, on which perjury could not be assigned if it was wilfully false, would not, in law, be an affidavit at all"); *People to Use of Esper v. Burns*, 161 Mich. 169, 173, 125 N.W. 740 (1910) ("[a]n affidavit has been defined to be a declaration on oath, in writing, sworn to by a party before and attested by some person who has authority to administer oaths"). Furthermore, none of these exhibits were executed as unsworn declarations made under penalty of perjury pursuant to 28 U.S.C. § 1746.[4] Accordingly, the Court gives no weight to these statements as "affidavits" in support of plaintiff's claim.

**2.  Defendants' certifications and plaintiff's medical records**

**a.  Defendants played no role in treating plaintiff's anxiety or panic attacks**

Defendants point out that they did not treat plaintiff's reported anxiety or panic attacks. *See* Certification of Daniel Spitters, P.A. at ¶¶ 6, 29, 30 (docket no. 8-2). These conditions were treated by other health care providers at the correctional facility. For example, on April 22, 2011, plaintiff saw non-party Dr. Pages for treatment of depression. Medical Records at p. 2 (docket no. 10-2). The doctor noted that plaintiff was very difficult to deal with "due to his insistence on

---

[4] The Court notes that even if these exhibits were properly executed affidavits, none of the inmates describe what they saw. Rather, the statements simply contain their conclusion that plaintiff suffered a seizure. Since there is no evidence that these inmates had medical training, they had no basis to diagnose plaintiff's condition as a seizure as opposed to conduct mimicking a seizure.

certain non-formulary meds" and that plaintiff was "seeking meds that make him feel high." *Id.* Dr. Pages' clinical assessment included: mood disorder, unspec.; polysubstance dependence; and personality disorder, NOS. *Id.* at p. 3. In addition, non-parties Reid Taylor, D.O. and Michell M. Wellman, M.A., performed a mental health assessment on February 24, 2012, in response to plaintiff's kite request in which he claimed that medical staff caused him to suffer from anxiety. *Id.* at p. 60. The examiner felt that plaintiff used a loud voice during the examination in an attempt to intimidate medical providers. *Id.* The examiner's clinical assessment included: dependence, barbituate/sedative; dependence, opiate type; malingering; and personality disorder. *Id* at p. 61. The examiner felt that plaintiff "appears to be med seeking" and was "very fixated on getting Klonapin [sic]." *Id.* Plaintiff also sought medical care for anxiety on May 9, 2012. *Id.* at pp. 64-65. In short, there is no record that defendants treated plaintiff for anxiety or panic attacks.

        **b.**        **Plaintiff's history of treatment with respect to seizures**

In their brief, defendants provide a comprehensive summary of the medical treatment provided to plaintiff, with citations to the medical record and defendants' certifications.[5] Because plaintiff has alleged, among other things, that defendants unjustly discontinued his medication and ignored his continued requests for medical treatment, the court will reproduce this uncontested summary in its entirety:

> Plaintiff has been seen multiple times by various health care providers while he has been incarcerated at G. Robert Cotton Facility ("JCF") and Earnest C. Brooks Correctional Facility ("LRF") regarding treatment of his reported seizures and various other medical conditions. (Exhibit A-1, Medical Records at 1-69, Exhibit A Certification of Daniel Spitters, P.A. at ¶ 4).

---

[5] Plaintiff's 69-page medical record appears in docket no. 10-1 (pages 1-50) and docket no. 10-2 (pages 51-69).

The Plaintiff has a history of drug abuse. *Id.* at ¶ 5. His medical chart reflects various behavioral problems relating to his attempts to obtain access to various prescription drugs. *Id.* While incarcerated, the Plaintiff has a history of seeking out medications "that make him feel high." *Id.* The Plaintiff has been particularly insistent in requesting the medication Klonopin which is used in treating seizure disorders. *Id.* Klonopin (clonazepam) is a benzodiazepine class sedative/hypnotic and anticonvulsant. *Id.* Klonopin can be addictive and is a Schedule IV controlled substance. *Id.* Klonopin is easily abused and is not on the MDOC formulary, meaning that it cannot be prescribed unless there is an exceptional and compelling reason for the particular medication and it is approved by the Regional Medical Officer. *Id.*

On April 2, 2011, a Medical Management report entered by Dr. Pages, while the Plaintiff was incarcerated at JCF, states that the Plaintiff was difficult to deal with due to his insistence on non-formulary medications. *Id.* at ¶ 6. Dr. Pages also reported that the Plaintiff is a poor historian and is seeking medications that make him feel high. *Id.*

On June 23, 2011, the Plaintiff was seen by Dr. Karen Rhodes at a provider visit. Dr. Rhodes noted that the medical record reflected that there was no documentation of seizure for over a year and that the Plaintiff would be weaned off his seizure medication, Klonopin. *Id.* at ¶ 7. Dr. Rhodes entered an order that the Plaintiff begin weaning off Klonopin. *Id.*

On June 27, 2011, a medical management report was entered by Dr. John Taglia stating that the Plaintiff presents with substance abuse. *Id.* at ¶ 8. Dr. Taglia further reported that the Plaintiff claimed a history of seizure disorder but there is almost no chart evidence of any seizure activity. *Id.*

On July 11, 2011, the Plaintiff was evaluated by Richard Miles, M.D. for a possible seizure. *Id.* at ¶ 9. The Plaintiff reported that he woke up from a possible seizure with two officers standing over him. The Plaintiff reported that his Klonopin prescription was being tapered per orders of the psychiatrist treating him. *Id.*

On July 19, 2011 a Regional Medical Officer ("RMO") review was entered requesting that the Plaintiff's history of seizures be confirmed as it had not been mentioned in any of the Plaintiff's prior prison intake reports. *Id.* at ¶ 10.

On July 28, 2011, the Plaintiff was evaluated by Dr. Richard Miles for a reported seizure. *Id.* at ¶ 11. Dr. Miles observed the Plaintiff lying on the floor with his body jerking in a rhythmic fashion for a period of 3-4 minutes. *Id.* Dr. Miles referred the Plaintiff to an outside emergency medical facility where the Plaintiff was treated and released on July 28. *Id.* The evaluating emergency room physician's discharge summary stated that the Plaintiff had a reported seizure prior to admission.

*Id.* After examining the Plaintiff and hearing the Plaintiff's description of the reported seizure, the treating physician discharged the Plaintiff with the diagnosis of "seizure disorder" and gave standard instructions on how to handle any future seizures. *Id.*

Also on July 28, upon return to the prison facility, Cindi Murphy, R.N. was called to see the Plaintiff for complaints of chest pain. *Id.* at ¶ 12. The Plaintiff stated he was anxious and that his chest was hurting. *Id.* Ms. Murphy reports that the Plaintiff used abusive language when she stated his vital signs were normal and it did not appear that he had a cardiac issue. *Id.* The Plaintiff had received a full physical exam earlier that day at his emergency room visit and all vital signs were normal. *Id.*

On July 29 and August 1, 2011, Teresa Farley filed behavioral health segregation reports stating that the Plaintiff had been placed in behavioral segregation for disciplinary reasons including fighting with officers, assaulting staff and threatening behavior. *Id.* at ¶ 13. The Plaintiff stated he had discontinued his Trileptal prescription because he felt it caused seizures instead of preventing them. Ms. Farley reported that the Trileptal would not be considered a cause of the Plaintiff's reported seizures. Trileptal is a mood-stabilizing and anticonvulsant medication.

On August 17, 2011, the Plaintiff was evaluated by Lawrence Schloss in segregation as the Plaintiff wanted to discuss his medication issues. *Id.* at ¶ 14. Dr. Schloss reported that the Plaintiff was in segregation for unpredictable behavior and fighting with officers. When he was taken to medical services the Plaintiff received a ticket for threatening behavior against a nurse. Dr. Schloss added that there was little documentation in the Plaintiff's medical chart to support the Plaintiff's stated seizure disorder. *Id.* Dr. Schloss reported that, as the Plaintiff was being transferred to a new facility, the changes in his medications would be deferred. *Id.*

On August 19, 2011, the Plaintiff was evaluated by Venettie Poston upon his transfer to LRF. *Id.* at ¶ 15. The Plaintiff was transferred directly to a segregation unit at LRF due to his two- month detention for assault and battery on staff at JCF. *Id.*

On August 22, 2011, Defendant Spitters evaluated the Plaintiff in a chronic care visit. *Id.* at ¶ 16. He reported that the Plaintiff had an extensive history of polysubstance abuse and was Hepatitis C positive. He also reported that the Plaintiff was not happy with the discontinuation of certain of his medications. *Id.*

On September 11, 2011, the Plaintiff was seen by Laura Mitteer, R.N. after she received a report that the Plaintiff had a seizure. *Id.* at ¶ 17. Ms. Mitteer reported that she observed the Plaintiff with muscle rigidity for a period of about 15

seconds, then he suddenly became alert and oriented and able to ambulate without assistance. There was no loss of bladder or bowel control and no postictal symptoms [2] *Id.*

On September 12, 2011, the Plaintiff was seen by Dr. Reid Taylor. *Id.* at ¶ 18. Dr. Taylor reported that the Plaintiff presented with issues of seizures and need for psychiatric evaluation. Dr. Taylor reported that the Plaintiff had "a long and passionate history of drugseeking and malingering" including heroin addiction. *Id.* Dr. Taylor reported that he saw little evidence of true seizure activity — only self-reported seizures. The Plaintiff was vague in describing any documentation or formal testing for seizures. Dr. Taylor saw no basis for the Plaintiff being on Klonopin and was "in complete agreement with the plan to taper and discontinue Klonopin." *Id.* The Plaintiff had been prescribed Tegretol for pain relief and Trileptal as a mood-stabilizing drug and an anticonvulsant. The Plaintiff's medication orders entered on September 12 reflect that the Plaintiff was not taking his prescribed Trileptal or Tegretol (Carbamazepine). *Id.* Dr. Taylor therefor recommended discontinuing those medications. *Id.*

On September 13, 2011, the Health Assessment report generated by Terri Helton, R.N. noted that the Plaintiff's Klonopin prescription was being tapered. *Id.* at ¶ 19. On September 9, the Plaintiff's Klonopin prescription was reduced from three doses a day to two doses a day for a period of seven days. On September 16 the taper period was complete and the Klonopin was discontinued. *Id.*

On September 13, the Plaintiff was seen by Defendant Dr. Abdellatif who reported that the Plaintiff was seen for evaluation and refusal to take medications. (Exhibit B, Certification of Badawi Abdellatif, M.D. at ¶ 9). The Plaintiff stated that he was not taking his Trileptal which was ordered by the psychiatry department. *Id.* Trileptal is a mood stabilizing drug. It is also an anticonvulsant and is used in the treatment of seizures. *Id.* The Plaintiff stated he wanted a renewed Klonopin prescription and would not take the prescribed Trileptal. When Defendant Abdellatif informed him that this medication issue had already been addressed with him, the Plaintiff became angry and abusive using offensive language. *Id.*

On September 14, 2011, the Plaintiff was seen by Ms. Mitteer who immediately responded when she received a call that the Plaintiff was on the floor in the chow hall. (Exhibit A, at ¶ 21). The sergeant on duty reported that the Plaintiff fell off his chair. *Id.* Ms. Miteer reported that when she arrived the Plaintiff slightly opened his eyes then tensed his extremities for about 20 seconds. He was then alert and oriented without any further symptoms. *Id.* He was taken to health services for further evaluation. There were no postictal symptoms noted. *Id.* Ms. Mitteer noted that the Plaintiff had seen a medical provider the previous day and was angry over the decrease and weaning from his Klonopin prescription. *Id.*

11

On September 20, 2011, the Plaintiff was evaluated by Claire Velden, R.N. for a "questionable seizure." *Id.* at ¶15. Ms. Velden observed the Plaintiff shaking on the floor. When placed in a wheelchair, the Plaintiff rested his head in the backrest and suddenly looked up asking for his glasses. *Id.* After that conversation, Plaintiff then flopped backward and resumed shaking. Upon arrival at health services, the Plaintiff was extremely talkative and argumentative with no symptoms of postictal state. He wanted to discuss his medications and weaning from Klonopin with a medical provider. *Id.*

On September 20, the Plaintiff was evaluated by Ms. Mitteer for a second reported seizure. *Id.* at ¶23. She observed the Plaintiff in the ward alley lying on his right side shaking with his glasses folded next to his head. Upon arrival at health services, the Plaintiff was able to walk with no postictal signs. He again requested controlled substances such as Klonopin. *Id.*

On September 27, Defendant Spitters saw the Plaintiff as he was not satisfied with his Tegretol prescription stating it made him feel like he was "walking crooked." *Id.* at ¶ 24. The Plaintiff stated he was an "old druggie" and "I know the drugs I want." He stated further that he had been fighting "tooth and nail" to get Klonopin for his anxiety issues. *Id.* Defendant Spitters explained to the Plaintiff the taper process of his Klonopin prescription. *Id.*

On October 18, 2011, Defendant Spitters entered a chart update reflecting the Plaintiff's medications of Tegretol (Carbamazipine), Vitamin D and Nortriptyline (an antidepressant). *Id.* at ¶ 25. The chart review reflected that the Plaintiff was declining to take the Tegretol or Vitamin D. On November 1, Dr. Abdellatif also noted that the Plaintiff was refusing his medications. *Id.*

On November 16, the Plaintiff was evaluated by Dr. Abdellatif for a chronic care visit. (Exhibit B, ¶ 9). He noted that the Plaintiff had a questionable seizure disorder and was taking no medications for seizures. *Id.* In determining that the Plaintiff's seizure disorder was questionable, he noted that the Plaintiff reported that that his seizures were much better these days and lasted "2-3 hours instead of 7-8 hours." *Id.* A true seizure's duration is a minute or two. Dr. Abdellatif also noted that the Plaintiff had no aggravating symptoms associated with his reported "seizures." *Id.* He reported that the Plaintiff's Hepatitis C infection was evaluated and his liver enzymes were within normal range. *Id.*

On December 2, 2011, Brooke Cooper responded to a call that the Plaintiff had experienced a seizure in the chow hall. (Exhibit A, at ¶ 27). Ms. Cooper observed the Plaintiff lying on the floor. The officers present confirmed that the Plaintiff placed his eyeglasses on a table prior to falling to the floor. The Plaintiff attempted to thrust himself out of the wheelchair he was placed in for transport to

health care for evaluation. At health care, the Plaintiff was alert and oriented and able to walk with a steady gait. *Id.*

On December 26, 2011, the Plaintiff was evaluated by Ms. Cooper who reported that the Plaintiff stated he was experiencing seizures and medication side effects. *Id.* at ¶ 28. He reported that he was experiencing dizziness from Tegretol (which he had not taken for months) and he wanted to go back on Klonopin. *Id.*

On February 24, 2012, the Plaintiff was seen by Michell Wellman who reported that the Plaintiff was extremely agitated and fixated on medical issues. *Id.* at ¶ 29. The Plaintiff reported that he "needed Klonopin to lower his 'gamma' levels and that he wanted to assault the physician's assistant." *Id.* A discharge from psychological treatment was issued on February 24 based on the Plaintiff withdrawing his consent to treatment. *Id.* Michell Wellman reported that the Plaintiff appears to be "med seeking" and is "fixated on getting Klonopin." *Id.*

On May 9, 2012, a case management report was issued by Michell Wellman stating that the Plaintiff presented with anxiety. He had re-entered a cognitive restructuring group and appeared stable. *Id.* at 64-65. *Id.* at ¶ 30.

[FN 2. The postictal state is the altered state of consciousness that a person enters after experiencing a seizure. It usually lasts between 5 and 30 minutes, but sometimes longer in the case of larger or more severe seizures and is characterized by drowsiness, confusion, nausea, hypertension, headache or migraine and other disorienting symptoms. Additionally, emergence from this period is often accompanied by amnesia or other memory defects. It is during this period that the brain recovers from the trauma of the seizure.]

Defendants' Brief at pp. 2-8 (docket no. 8).

As the uncontested summary demonstrates, defendants did not ignore plaintiff's requests for medical care. To the contrary, they provided medical care to plaintiff on a number of occasions, sought to wean him from Klonopin and provided him with another medication used as an anti-convulsant. A recurring issue in plaintiff's treatment was whether he even needed medication to control seizures. As defendant Spitters observed in his certification, "[a]ccording to the medical records and multiple observances by various health care providers, [plaintiff's] reported seizure activity is highly suspicious." Spitters Cert. at ¶ 31. Spitters opined: that the clinical

13

observations of plaintiff both during and after his purported seizures do not support plaintiff's reports of seizures; that there is no independent medical test result or other record indicating that plaintiff has a seizure disorder; that there is no indication that plaintiff requires Klonopin to treat his purported seizures; and that plaintiff was "attempting to mimic seizure activity for the purpose of obtaining desired medications." *Id.*

In evaluating plaintiff's claim, Dr. Abdellatif noted the questionable nature of plaintiff's seizure disorder:

> I saw the patient on September 13, 2011 for evaluation and for his refusal to take medications. [Medical Records] at 42-43. The patient stated that he was not taking his Trileptal which was ordered by the psychiatry department. *Id.* Trileptal is a mood stabilizing drug. It is also an anticonvulsant and is used in the treatment of seizures. *See*, Regional Medical Officer Review, *Id.* at 13. The patient stated he wanted a renewed Klonopin prescription and would not take the prescribed Trileptal. When I informed him that this medication issue had already been addressed with him, the patient became angry and abusive using offensive language. *Id.* at 42-43.
>
> \*   \*   \*
>
> On November 16, 2011, I saw the patient for a chronic care visit. [Medical Records] at 53-56. I noted that the patient had a questionable seizure disorder and was taking no medications for seizures. *Id.* at 55. In determining that the patient's seizure disorder was questionable, I noted that the patient reported that that [sic] his seizures were much better these days and lasted "'2-3 hours instead of 7-8 hours." *Id.* at 53. A true seizure's duration is a minute or two. I also noted that the patient had no aggravating symptoms associated with his reported "seizures." *Id.*
>
> \*   \*   \*
>
> According to the medical records and multiple observances by various health care providers, the patient's reported seizure activity is highly suspicious. He has not exhibited typical signs of a seizure or any post-seizure symptoms such as loss of bladder/bowel control, tongue-biting, loss of consciousness, disorientation, postictal symptoms or any injury from falling. *Id.* at 34-35, 36-38, 44-49. The reports of various health care providers document atypical seizure activity including the patient starting and stopping seizure activity at will. *Id.*

14

> The treatment the patient has received for his medical conditions while he has been incarcerated has been appropriate. His Klonopin prescription was appropriately tapered once it was determined that it was not medically indicated. *Id.* at 66-69. Based on my evaluation of the patient and review of the patient's medical records, I agree with the decision to remove the patient from seizure medications as they are not indicated.

Certification of Dr. Abdellatif at ¶¶ 9, 11-13 (docket no. 8-4).

As reflected by plaintiff's medical history, plaintiff: appeared to start and stop his "seizures" at will; did not show the typical affect of someone suffering from a true seizure; placed or folded his glasses in a safe place before having a "seizure"; never had any injury related to a seizure (e.g., biting his tongue); and showed no evidence of typical post-seizure symptoms (e.g., the postictal state). In addition, plaintiff had a history of drug seeking behavior, which the medical staff recorded as obtaining Klonopin. Finally, both defendants determined that Klonopin was not indicated for plaintiff's medical condition.

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This action falls in the latter category. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004), quoting *Westlake*, 537 F.2d at 860 n. 5. While plaintiff disagrees with defendants' medical judgment with respect to treating his purported seizure disorder with a particular medication, and plaintiff wants to have treatment contrary to that judgment, this disagreement between plaintiff and his health care providers does not rise to the level of a federal constitutional claim. *See Woodberry v. Simmons*,

146 Fed.Appx. 976, 977 (10th Cir. 2005) ("a difference of opinion between a prisoner and the prison medical staff about medical treatment does not constitute deliberate indifference"); *Owens v. Hutchinson*, 79 Fed. Appx. 159, 161 (6th Cir. 2003) ("[a] patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim"); *Wright v. Genovese*, 694 F.Supp.2d 137, 155 (N.D.N.Y. 2010) ("[d]isagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment"). Accordingly, defendants are entitled to summary judgment on plaintiff's Eighth Amendment claim.

### C. Retaliation

Plaintiff has also included a retaliation claim against defendants. To prove a First Amendment retaliation claim, a plaintiff must establish three elements: "1) the plaintiff engaged in activities protected by the Constitution or statute; 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith*, 250 F. 3d at 1037, *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require

non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (internal quotation marks omitted).

As an initial matter, plaintiff has failed to alleged or demonstrate that he engaged in any protected activity which would give rise to a First Amendment retaliation claim. While plaintiff alleged that he filed a grievance on November 14, 2011, he engaged in this protected activity more than two months *after* defendants allegedly retaliated against him by discontinuing the Klonopin. The filing of a grievance in November 2011 could not be the "cause" of alleged retaliation which occurred in September 2011. The only other conceivable protected activity would be plaintiff's vague allegation that he was taken off of the Klonopin in apparent retaliation for arguing with a nurse. This activity is set forth in plaintiff's complaint, which alleged that he had "numerous disputes" with a night shift nurse, had a "heated discussion" with Spitters about the discontinuation of the Klonopin, and that Spitters allegedly told plaintiff that "[t]oo bad, you shouldn't have given my Assistant so many problems." However, plaintiff's alleged disputes with a nurse did not constitute protected activity. Plaintiff's allegation that he had "disputes" with a nurse at the prison is not protected activity under the First Amendment which can give rise to a retaliation claim. *See, e.g., Goddard v. Kentucky Department of Corrections*, Nos. 99-5348 and 99-5971, 2000 WL 191758 at *2 (6th Cir. Feb. 7, 2000) ("[plaintiff prisoner's] cursing to correctional officials and complaining about his treatment he received . . . is not an activity that may be protected under the First Amendment").

Furthermore, even if plaintiff had alleged that he engaged in protected activity, there is no evidence that defendants took adverse action. In *Smith v. Yarrow*, 78 Fed. Appx. 529 (6th Cir.

2003), where an inmate contended that he received substandard medical care in retaliation for exercising his First Amendment rights, the Sixth Circuit held:

> Because Plaintiff has not established that any care he underwent was substandard, Plaintiff did not suffer an adverse action from his doctors. Therefore, Plaintiff's retaliation claim (based on First Amendment theory) must necessarily fail.

*Smith*, 78 Fed. Appx. at 543. Here, the medical record does not reflect that plaintiff received substandard care in this instance. Rather, the record reflects that plaintiff disagreed with the medical providers on whether he needed one specific medication to treat a "highly suspicious" seizure activity. Accordingly, defendants are entitled to summary judgment on plaintiff's First Amendment retaliation claim.

### III. Recommendation

For the reasons set forth above, I respectfully recommend that defendants' motion for summary judgment (docket no. 8) be **GRANTED** and that this action be **DISMISSED**.

Dated: December 10, 2013           /s/ Hugh W. Brenneman, Jr.
                                   HUGH W. BRENNEMAN, JR.
                                   United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).